# EXHIBIT 12

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF PIERCE

| | |
|---|---|
| GERRI S. COOGAN, the spouse of JERRY D. COOGAN, deceased, and JAMES P. SPURGETIS, solely in his capacity as the Personal Representative of the Estate of JERRY D. COOGAN, Deceased,<br><br>               Plaintiffs,<br><br>        vs.<br><br>BORG-WARNER WORSE TEC INC.; et al,<br><br>               Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Superior Court<br>) No. 15-2-09504-3<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**VERBATIM REPORT OF PROCEEDINGS**

Pierce County Superior Court
Tacoma, Washington
Before the
**HONORABLE STANLEY J. RUMBAUGH**

Raelene Semago
Official Court Reporter
930 Tacoma Avenue
334 County-City Bldg.
Department 3
Tacoma, Washington  98402

```
1                    A P P E A R A N C E S

2

3       FOR THE PLAINTIFFS:

4        JESSICA M. DEAN
         BRIAN D. WEINSTEIN
         BENJAMIN ADAMS
5        Attorneys at Law

6

7       FOR DEFENDANT NATIONAL AUTOMOTIVE.
        PARTS ASSOCIATION & GENUINE PARTS COMPANY:

8        JEANNE LOFTIS
         BRENDAN P. HANRAHAN
9        JOHN OSBURN
         Attorneys at Law

10

11      FOR DEFENDANT J-M MANUFACTURING, INC.:
         DAVID A. SHAW
12       MALIKE I. JOHNSON
         CHRIS MASSENBURG
13       CARRIE S. LIN
         Attorneys at Law

14

15      FOR DEFENDANT BORG-WARNER MORSE TEC, LLC:

16       RICHARD D. ROSS
         MATTHEW F. QUIGG
17       Attorneys at Law

18      FOR DEFENDANTS PNEUMO ABEX, LLC,
        & DANA COMPANIES, LLC:

19

20       JOHN R. BRYDON
         Attorney at Law

21

22

23      FOR DEFENDANT DANA COMPANIES, LLC:

         T. LYNN WALDEN
24       Attorney at Law

25
```

1          T A B L E   O F   C O N T E N T S

2                    February 23, 2017

3     TESTIMONY                                    PAGE

4

5     LIANE BREWER
          Direct Examination By Ms. Dean..............  25
6

7
      EXHIBITS                                     PAGE
8
      234      ........................................ 6
9     236      ........................................ 80
      238      ........................................ 79
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      BE IT REMEMBERED that on Thursday, February 23, 2017,

2  the above-captioned cause came on duly for hearing before

3  the **HONORABLE STANLEY J. RUMBAUGH**, Judge of the Superior

4  Court in and for the County of Pierce, State of

5  Washington; the following proceedings were had, to wit:

6

7                        <<<<<< >>>>>>

8

9

10          (The following proceedings were held

11           outside the presence of the jury.)

12          THE COURT:  Here is a phrase that I have been

13  waiting for a long time to use:  Next witness.

14          MS. LOFTIS:  And Your Honor, I have a few

15  issues.

16          THE COURT:  Okay.

17          MS. LOFTIS:  Okay.  Right now we are

18  redacting, and I will show this to plaintiff's counsel,

19  this medical record that was marked as Exhibit 188 in its

20  unredacted form, and I believe that we have now removed

21  cirrhosis, drinking, from the medical record, and I would

22  like to have it marked as Exhibit 234 and entered into

23  the --

24          THE COURT:  The redaction that you provided

25  earlier still mentions cirrhosis, so you are taking that

1    out?

2              MS. LOFTIS:  Yeah, that should be out.  I

3    actually gave you a copy where I thought that everything

4    was properly redacted, but it wasn't.  So now we have

5    further redactions on this, Ms. Dean, with all the

6    whiteouts being additional redactions.

7              THE COURT:  If you would show me the scrubbed

8    exhibit.

9              MS. LOFTIS:  The scrubbed times two exhibit is

10   right there, and if she needs more time to look at it,

11   that's fine.  We don't have to do it this second.  I have

12   some other issues as well.

13             THE COURT:  While we are on the topic of

14   Exhibit 234, which is a November 11, 2015, consultation of

15   Jerry Coogan by Dr. Glenn Nudelman, which has been

16   redacted to remove reference to smoking or to drinking and

17   liver cirrhosis, it seems like.

18             I will listen to any further objections if you

19   have them.

20             MS. DEAN:  Your Honor, I don't think so.  This

21   was just provided.  Other than taking off the base label,

22   the ER 904 at the bottom and option of completeness, we

23   have some other records from this same facility that we

24   would like to include.

25             THE COURT:  I will look at those if you want

1    to present them.  I'm now focused on Exhibit 234.

2            MS. DEAN:  As it relates to what was just

3    handed, as long as the agreement we had on removing the

4    Bates happens, the other redactions that were supposed to

5    have happened, they have happened.

6            THE COURT:  Moving the dates --

7            MS. DEAN:  These are his HMRCO.

8            THE COURT:  I thought you said dates.

9            MS. DEAN:  B-A-T-E-S.

10           THE COURT:  HRMC, I mean, does that really

11   matter?  I can see ER, because they have heard about ER

12   and so I will take that out.  I mean there is some other,

13   HRMC.  I don't know.  That sounds like some regional

14   medical center.  It's their document.

15           MS. DEAN:  The document 55 on the top and

16   bottom, again, wasn't as much of a concern as the internal

17   GPC Bates that is right below it.

18           THE COURT:  So what I'm going to do is take

19   the G -- or the ER and just Xing it out.  And now I will

20   have Ms. Reagan white out and X out, and I will admit 234.

21               (Exhibit No. 234 admitted.)

22           MS. DEAN:  And to complete the document, we

23   will just do that at a later time, Your Honor?

24           THE COURT:  Yes.  Get together and make sure

25   that it's scrubbed.

1          MS. LOFTIS:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          Go ahead, Ms. Loftis.

4          MS. LOFTIS:  Sort of a big issue, Your Honor,

5     and then a little issue.  So which one do you want first,

6     Your Honor?

7          THE COURT:  You pick.

8          MS. LOFTIS:  I will pick.  So we have had this

9     continuing concern with Liane Brewer, Your Honor.  She was

10    handed a subpoena that was invalid.  The plaintiff's

11    counsel has never sought to serve her with a valid

12    subpoena.  She works and resides in Spokane, and they have

13    never provided her with a witness fee.  Additionally, we

14    expect that any testimony that is going to be offered by

15    plaintiff or asked of Ms. Brewer by plaintiff is going to

16    be cumulative of the testimony that Byron Frantz already

17    gave over the course of two separate days.

18          The other concern that I have, Your Honor --

19          THE COURT:  Can we address that because I

20    thought that Byron Frantz was the corporate representative

21    and, so is -- I'm sorry --

22          MS. LOFTIS:  Liane Brewer.  She was served,

23    Your Honor, with a subpoena in her own name.  She was not

24    served as a corporate representative, and also she has not

25    been disclosed as a witness for plaintiff's counsel in

1        this case.

2                THE COURT:  Didn't we have a discussion about

3        the fact that she would be a corporate representative

4        related to the specific interactions she had with Jay

5        Coogan, because she was 20 years, plus or minus, visiting

6        his NAPA facility?

7                MS. LOFTIS:  She did, Your Honor.  She

8        provided her deposition testimony in response to a

9        30(b)(6) request, but we are now here at trial and

10       30(b)(6) has no application to a trial witness.  So right

11       now we are here either under 43(f), which was untimely

12       served, and a witness has already been provided in

13       response to 43(f), or we are here under a subpoena that

14       was improperly served.  They have had plenty of time and

15       notice to correct that deficiency, and they haven't done

16       it, nor have they provided the witness with a fee and

17       travel expenses, et cetera.

18               THE COURT:  We are also here with her sitting

19       at counsel table where parties sit, and within the

20       jurisdiction of the Court.  So I can order her to testify

21       right this very minute.

22               MS. LOFTIS:  Right, and Your Honor, and she is

23       here pursuant to the Court's order.  And she is -- has

24       been a representative at the table.  But what we are

25       really getting to is whether she should be compelled to

1     testify in this case when she is not listed as a witness

2     on plaintiff's witness list, when she hasn't been provided

3     a proper subpoena, and when we have already provided a

4     corporate witness in response to a defective 43(f).

5                    THE COURT:  Ms. Dean.

6                    MS. DEAN:  Your Honor, I want to hand up to

7     the Court the notice of deposition, videotape deposition

8     of Ms. Brewer.  I feel like this has been discussed at

9     length, so...

10                   THE COURT:  So we are not -- I understand she

11    has been deposed.  Everybody had a run at it and got to

12    ask --

13                   MS. DEAN:  It's for a different purpose.  In

14    the actual determination notice for Ms. Brewer that

15    occurred, the agreement that I showed in emails and in

16    other places is actually stated.  The Court agreed with me

17    that they would bring someone live, but said there is some

18    ambiguity.  There was none.  And it was because -- I

19    didn't give you the full information, but, Your Honor, it

20    was Exhibit A to the notice of her deposition.  It is

21    written, GPC will produce their witness to testify live in

22    trial at this lawsuit.

23                   And then to make it even clearer at the

24    beginning of that deposition the videographer states, we

25    are on the record, this is a 30(b)(6) videotaped

1    deposition of Genuine Parts, and I confirm on the very

2    next page she is that representative.

3                THE COURT:  Hang on just a second.  All right.

4    So do you have a copy of this, Ms. Loftis, the Plaintiff's

5    fourth Amended Notice of Videotape Deposition.

6                MS. LOFTIS:  Your Honor, I have seen it

7    before.

8                THE COURT:  So what it says is, witness and

9    it's a designation deposition.  I'm under the impression,

10   correct me if I'm wrong, that in response to this notice

11   it was Ms. Brewer whose deposition was taken.  I believe

12   that that is correct, correct?

13               MS. LOFTIS:  Yeah, Your Honor, we complied

14   with the discovery request, and there's been no complaints

15   about that.

16               THE COURT:  And then it says GPC/NAPA will

17   produce their witness, presumably related to their witness

18   in this, you know, this video deposition, to testify live

19   at trial in this lawsuit.  I understand there have been

20   timing issues that affects the trial from almost the very

21   beginning.  But your position is that that is insufficient

22   notice of trial attendance to tell Ms. Brewer to be here.

23   I don't want to misstate your argument.

24               MS. LOFTIS:  So we are now at the agreement

25   between counsel about what we would do, and the agreement

1    between counsel is that we would produce a witness live in

2    this case.  And we have done that over the course of two

3    days.  We produced Byron Frantz.

4            Ms. Dean was well aware that the witness that

5    would come out here and testify was Byron Frantz.  She has

6    known about that since day one of this trial.  We

7    conferred about the date that he would come, and in fact,

8    that is why she served Liane Brewer in Liane Brewer's name

9    with a defective subpoena, because she knew that there was

10   no agreement to provide Liane Brewer as a witness in this

11   case.  Otherwise, there would be no reason for her to

12   provide a subpoena.

13           THE COURT:  Well, except out of an abundance

14   of caution perhaps, but more to the point, Ms. Brewer is

15   sitting here as a party at counsel table.  She has been

16   here for days, and she has been deposed, so she has fair

17   notice of what this is all about.  She has listened to the

18   testimony.  And because she is now within the jurisdiction

19   of the Court as a party, I can order her to testify right

20   now, and if that's what the next witness is going to be,

21   then that's what it will be.

22           MS. DEAN:  Yes, Your Honor, and just for

23   purposes of scheduling, our intent is only to ask about

24   the same exact subjects that were identified in this

25   notice.

1           THE COURT:  And not crossing over to

2      Mr. Frantz.  And then Ms. Loftis is correct, we don't need

3      two witnesses to testify about the same thing.

4           MS. DEAN:  I'm saying within the distinctions

5      that they drew and accepting those and the type of notice.

6           THE COURT:  So Ms. Loftis, was that the big

7      issue, or was that the small issue?

8           MS. LOFTIS:  That was the small issue,

9      Your Honor.

10          THE COURT:  Okay.  What's the big issue?

11          MS. LOFTIS:  When we gave the Court an

12     indication of how long this case would take, Your Honor,

13     my recollection --

14          THE COURT:  You mean when you told me that you

15     would be done by the end of this week, or more recently by

16     the end of next month?

17          MS. LOFTIS:  Before the case started, so

18     ancient history, I guess at this point.

19          THE COURT:  All history is ancient, it's just

20     a matter of degree.

21          MS. LOFTIS:  So we told the panel of

22     prospective jurors, Your Honor, that the trial was

23     expected to take three to four weeks to try, and that they

24     should check their calendars into the fifth week.  And as

25     the Court is well aware, we are now in the fifth week of

1    this case with no particular end in sight to plaintiff's

2    case in chief.

3              We feel that we have been severely prejudiced

4    by the length of time that we have remained in plaintiff's

5    case in chief.  Your Honor, I have tried asbestos cases

6    before.  They have routinely taken 13 to 15 court days to

7    try.  I have never tried a case against Dean Omar before

8    this trial started.  I had done no research in terms of

9    figuring out how long a trial involving Dean Omar

10   typically takes, but it's now my understanding from

11   talking with counsel across the country that this is not

12   unusual for a case involving this particular counsel to

13   take three times to four times longer than a normal

14   mesothelioma case.

15             So I, you know, I realize, Your Honor, that I

16   could have done that research ahead of time and tried to

17   provide you and the prospective jurors a better

18   understanding of the time constraints, but not only did I

19   not put aside ten weeks to try this case, but I'm

20   concerned, Your Honor, that you have not put aside ten

21   weeks to try this case, your staff has not, and I

22   understand that as officers of the court, it seems like

23   you guys are willing to go forward with that, despite the

24   doubling of the time limit.

25             But I'm concerned and I would like the jurors

PRELIMINARY MATTERS                          13

1   to be asked what type of hardship this now presents, and I

2   don't want to invest any more of my client's money or time

3   on this case that has really no hope, in my opinion, of

4   being successfully completed.

5             We are not in a position to accept less than a

6   full jury panel on any verdict that comes down in this

7   case.  I do not have client authority to take a verdict of

8   less than 12 jurors, and I'm concerned, Your Honor, and I

9   would move for a mistrial at this point rather than

10  continuing to invest time and money, and I would ask the

11  Court to award costs to us from the Dean Omar firm with

12  them knowing their own track history, knowing how long

13  that they would take with witnesses.  It's unprecedented,

14  Your Honor, to have a company witness on the stand for two

15  days or to have Dr. Brodkin on the stand for two full days

16  in plaintiff's case in chief.

17            THE COURT:  Well, I would observe a couple of

18  things before I hear from you, Ms. Dean.

19            MS. DEAN:  Sorry?

20            THE COURT:  The prolonging of the testimony,

21  particularly of Dr. Brodkin, was not necessarily

22  occasioned to merely be requested by plaintiff's counsel.

23  All counsel asked questions in great detail, in my view

24  greater detail than is required, and in the jury's view

25  I'm sure that they were lost in a welter of facts and

1   figures that they -- to the point where they quit

2   listening, but you make your presentations the way you

3   want to.  You know, I have only observed that I have been

4   a jury watcher for many years, for a long time, and that's

5   my perception.

6              As far as a mistrial, we still have 13 jurors.

7   Nobody has told me they are going to bail, and in fact,

8   Juror No. 13, you know, kind of struggled through her

9   illness and she is ready to hang with us.

10             As far as the timing of the trial, there is no

11   authority that I know of that allows a state court judge

12   to regulate the length of time that a trial is going to

13   last.  I mean we are here.  Yes, I do have other things to

14   do, just like everybody else.  But the way it works in

15   this country is that when your case gets started, you

16   know, you have got the floor, and what you do with it,

17   assuming that, you know, the testimony is all relevant, is

18   up to you.  However long they take, however long they

19   take -- I tried a child rape case.  I thought that it

20   would take three weeks.  It went seven.  This is not

21   unprecedented.  Things sometimes take longer than

22   predicted.  And so it's -- I appreciate your frustration,

23   and you know, to some degree I share the concern that this

24   is lasting way longer than it should, but you know, I have

25   no legal authority to curtail anybody's presentation.

1          You know, it's not like federal court where I

2    can tell you, you have another hour with this witness and

3    then you are done.  That would most certainly result in a

4    reversal and a note the from Court of Appeals saying have

5    you read the rules lately.

6          MS. LOFTIS:  Your Honor, what I'm suggesting

7    is that we do a do over, that we give the jurors the

8    courtesy of a more accurate representation of how long

9    this case lasts, and that we get 14 jurors who have time

10   to sit for ten weeks.  I'm concerned, Your Honor, that you

11   are going to get short with us, not that we have seen any

12   of that, but I'm concerned that that could happen, you

13   know, as this thing goes into the sixth and seventh and

14   eighth and ninth and tenth week.  And at this point we

15   have got witnesses scheduled all the way through the end

16   of March.  We have scheduled our witnesses for two days a

17   piece, given the amount of questioning that we expect to

18   happen.  We have never done that in a normal case.

19         THE COURT:  Well, I don't know what -- each

20   case is its own case.  So I have never been able to

21   discern any pattern really, and you are dealing with

22   personal injury cases.  They are personal to the people

23   who were injured and they take however long they take.

24   And so as far as a do over, I don't see how that gains you

25   any time because if the next trial is this long, just

1       because you have jurors that have been advised it's going

2       to be two months instead of one month, you have just lost

3       a month and $150,000 per party or more in costs and fees

4       and expenses.  Obviously, there has been an economical --

5               MS. LOFTIS:  Well, its the prejudice, Your

6       Honor, with --

7               THE COURT:  What's the prejudice?

8               MS. LOFTIS:  The jurors were told five weeks,

9       and plaintiff has taken up the entire five weeks with her

10      case.  In fact, she is going to take up six weeks with

11      just her case.  So as the jurors are looking at their

12      calendars, looking at their inconvenience, it will be us,

13      the three defendants that pay the price for plaintiff

14      taking up the entire estimated time and some.

15              THE COURT:  I don't know how you -- I don't

16      know how the length of time somehow equates to the

17      defendants bearing some sort of burden of the jurors in

18      duration of time.

19              First of all, none of them are complaining

20      about the duration of time.  They just want letters to

21      their employer to verify that they are still here, not in

22      Mexico, or doing whatever they want.

23              MS. LOFTIS:  Do they know, Your Honor, that we

24      have witnesses scheduled through the end of March and the

25      beginning of April?  That's the conversation I would

1       rather have today than two or three weeks from now.

2               THE COURT:  We have told them that the trial

3       is likely to last into the first week of April.

4               Anybody else have anything to add?

5               MS. DEAN:  Your Honor, yes.

6               THE COURT:  Because every time you add, you

7       waste time.  I have already ruled against the mistrial.

8               MS. DEAN:  I know.  I won't take longer than a

9       minute, but when there is stuff said in front of witnesses

10      and family I want to indicate that in the 12 cases I have

11      tried when I have done this, I have never gone over four

12      weeks.  And second, the issue of timing in this case that

13      other parties related, I think could be directly tied to

14      witnesses that weren't prepared in violation of Washington

15      rules, which is something that we want to talk about in

16      the examination time, the defendants.  And finally, I want

17      the record to be clear on this.  I offered, and the

18      defendants rejected, agreed upon time limits.

19              If there is any direction that the delay in

20      trial is driven by the plaintiff's side, I can attach that

21      as an exhibit, but the claims by Ms. Loftis are made

22      without any evidence, without any evidence whatsoever, and

23      are inaccurate and offensive.  And I just wanted to make

24      sure that the record and the people in this room were

25      aware that she is making things up.

1          THE COURT:  Thank you, Ms. Dean.

2          Mr. Massenburg, do you have anything to add?

3          MR. MASSENBURG:  We have plenty of time to

4     talk about our issues later, Judge.

5          THE COURT:  Well, that's sort of the issue.

6          Mr. Adams.

7          MR. ADAMS:  Since Ms. Brewer is testifying

8     next as the corporate representative for --

9          THE COURT:  As a corporate representative.

10         MR. ADAMS:  I wanted to just re-raise the

11    briefing that the parties submitted at the beginning of

12    this week.  I think on the discussion we had about a jury

13    instruction about what a corporate representative is.

14         THE COURT:  And I appreciate that you are

15    bringing that to my attention.  I think the appropriate

16    time to do that is when we instruct the jury.  I don't

17    like giving piecemeal instructions during the trial.  It's

18    better to have them all at once so I can give it to them

19    in writing, and they can refer back to those.

20         Mr. Walden, I don't want to cut you out of the

21    earlier conversation.  You might as well --

22         MR. WALDEN:  I have nothing to add to that.

23         THE COURT:  -- comment.

24         MR. WALDEN:  But I do have a couple of things

25    very briefly.  First of all, I don't want the record to be

1    silent or to reflect silence from me in terms of the

2    discussion earlier about some of the evidence and the

3    reference to aspersions being cast upon plaintiff's

4    counsel.  The intent behind a lot of my cross examination

5    into evident holes in the evidence is part of my

6    responsibility to defend the case, lack of the fiber

7    burden analysis when the literature recognizes that's a

8    useful tool, experts agree to that, lack of this testing,

9    that just goes to defending the case.  I did not -- in the

10   case that the Court was sensitive to my being

11   unprofessional in some way, that was not my intent.

12               THE COURT:  I didn't perceive that.  The Court

13   is not particularly sensitive.  The Court is not

14   particularly irritable, I don't think.  I, you know, want

15   to make sure that we can do this in as efficient of a way

16   as possible.  At the same time, I do find it necessary

17   because it is my role to enforce the rules of evidence,

18   and trial procedure, and you know, if I have to make that

19   point with certain emphasis, then that's what I'm going to

20   do.

21               As far as, you know, just on your point, yes

22   the digestion studies, you know, we had at least three and

23   maybe four different occasions where it was determined

24   that there were no digestion studies, that the defense

25   didn't have an opportunity to do them.  You can argue

1    about the timing, but the timing of death related to the

2    filing of suit had something to do with that.

3            I gave the instruction that there is no law in

4    Stevens County that requires an autopsy to be performed.

5    You are free to argue whatever you want to infer from

6    that, but I don't really think that the point needed to be

7    made three or four times, and that is what has contributed

8    to the trial being longer than everybody, I think, would

9    desire.  And I just call that to your attention because it

10   is a good illustration of cumulative testimony, and it may

11   have a different slant from different counsel, but at the

12   end of the day, the information that the jury could have

13   perceived if they were given it once, as opposed to three

14   or four times.

15           MR. WALDEN:  The other item, Your Honor, is so

16   simple you are going to appreciate it.  I think that is

17   that the videotape of the gasket removal has been now

18   loaded onto a memory stick and has been marked as an

19   exhibit, and I wanted the record to reflect that.

20           THE COURT:  Exhibit what?

21           MR. WALDEN:  It is Exhibit 235.

22           THE COURT:  All right.

23           MR. WALDEN:  And this was the video that was

24   played on January 30th, 2017, in the afternoon in the

25   beginning part of Dr. Brodkin's testimony.

PRELIMINARY MATTERS                    21

1          THE COURT:  Thank you for completing the

2     record.

3          MS. LOFTIS:  Your Honor, the third issue, so

4     we do have a copy of the subpoena that we would like to

5     serve on a witness that resides in Spokane County if I can

6     hand this to Ms. Reagan.  And I will give a copy to

7     plaintiff's counsel.

8          THE COURT:  All right.  So this is a subpoena

9     for Lyle Kenworthy requesting his presence at trial on --

10    I don't see a date.  I don't see a date, except for right

11    on the front of it.  March 6th.  Okay.

12         You are asking the Court to sign the subpoena?

13         MS. LOFTIS:  Yes.

14         MS. DEAN:  Your Honor, can I be heard?

15         THE COURT:  Yes.

16         MS. DEAN:  This is a witness name that I saw

17    for the first time when I got the schedule, which at some

18    point it is a witness not identified on any witness list.

19    I believe a subpoena, until there is a motion for leave to

20    amend a Jones inquiry made, a deposition of this person

21    done is premature.

22         I have learned since I was given this

23    information yesterday, not in a courtesy email or in a

24    conversation, but just a person on a list, I had never saw

25    before, that this is a gentleman in his 80's that I've

1    never spoke to and that's literally all I know.  And so

2    while we have a live witness here, I think we can handle

3    this later by signing a subpoena for a nondisclosed

4    witness that's never been deposed, I don't believe is

5    appropriate.

6                MS. LOFTIS:  That's misrepresenting the

7    record.

8                THE COURT:  Ms. Loftis wants to do this so it

9    will be timely for the service, so that if, indeed, I

10   ultimately decide this individual is to testify, that she

11   doesn't hear about the dispute in time.  We can deal with

12   the issues about the rest of the issues and whether there

13   is a proper disclosure and whether this witness has

14   anything noncumulative to add in due course, but I

15   appreciate Ms. Loftis' concern about timing.  On that

16   basis, given the fact that the proper fees appeared to be

17   tendered, I will sign the subpoena.  And again, that's not

18   going to limit your objection, if you have one, to this

19   individual being permitted to testify, and we can deal

20   with that in due course.

21               MS. DEAN:  Five weeks in a trial will bear out

22   what this is about at some point.

23               THE COURT:  We can go through the Jones

24   factors.  They almost universally mitigate in favor of

25   allowing the testimony under circumstances.  It's not

1     scheduled for another two weeks, plus.  So if you need to

2     interview this person, or if you need to take a short

3     deposition, you know, I will allow that to be done by

4     phone.  You can call him up, and if he will willingly talk

5     to you, you can get the location information.

6                     All right.  Was that the little issue?

7                     MS. LOFTIS:  That is the third issue that I

8     didn't even note.  I appreciate your patience.

9                     THE COURT:  Ms. Dean.

10                    MS. DEAN:  Your Honor, the only thing that we

11    talked about with Mr. Frantz where this is somewhat unique

12    in that -- and this was their client, we agreed that they

13    didn't have to show me their exhibits or Power Points

14    until after I was done, so they didn't have to preview.

15    So do I just ask or request a break when I am done,

16    Your Honor, so that we can do that?

17                    THE COURT:  Sure.  I'm not sure how long it's

18    going to take --

19                    MS. DEAN:  It won't take long.

20                    THE COURT: -- but it's not moving forward very

21    fast right now.

22                    So if we are ready to go?  Ms. Loftis, are you

23    ready?

24                    MS. LOFTIS:  Yes.

25                    MR. MASSENBURG:   Yes.

1          MS. LOFTIS:  Can she go up in the witness

2     stand, Your Honor?

3               THE COURT:  I will have her called.

4               (The following proceedings were held

5                in the presence of the jury.)

6               THE COURT:  Your next witness.

7               MS. DEAN:  At this time I would like to call

8     corporate representative for Genuine Parts Company Liane

9     Brewer.

10    LIANE BREWER,              having been first duly sworn to

11                              tell the truth, the whole truth

12                              and nothing but the truth,

13                              testified as follows:

14               THE COURT:  Please have a seat and tell us

15    your name and spell your full name.

16               THE WITNESS:  Okay.  Yes, my name is Liane

17    Brewer, and you spell my name L-I-A-N-E, B-R-E-W-E-R.

18               THE COURT:  All right.  You may proceed,

19    Ms. Dean.

20                      DIRECT EXAMINATION

21    BY MS. DEAN:

22    Q.  Good afternoon.

23    A.  Hi.

24    Q.  You understand that today we wanted to understand certain

25        things about Genuine Parts Company, and we listed out

```
 1        topics that we cared about and you were picked as the
 2        corporate representative for those topics.
 3   A.   One of the corporate representatives, yes.
 4             MS. LOFTIS:  Your Honor, that notice was
 5        served for a deposition.  That's not served as part of
 6        trial testimony.
 7             THE COURT:  You may want to amend your
 8        question, Ms. Dean.
 9   BY MS. DEAN:
10   Q.   And we had an opportunity, you and I, to discuss what you
11        knew about certain areas before you came here for trial?
12   A.   During the deposition?
13   Q.   Yes, ma'am.
14   A.   Yes, ma'am.
15   Q.   Okay.  I want to just talk to you about some of those
16        things today so the jury can hear them.
17   A.   Sure.
18   Q.   First of all, where are you from?
19   A.   I'm from Spokane, Washington.
20   Q.   And where have you worked for the last 32 years?
21   A.   At Genuine Parts Company in Spokane at the distribution
22        center.
23   Q.   And in terms of that distribution center in Spokane,
24        that's the closest distribution center for the NAPA stores
25        in Kettle and Colville, right?
```

1   A.   Yes.  We service both of those stores out of that

2        distribution center.

3   Q.   And you are in a unique position in that you are a witness

4        who actually knew Nancy and Jay before this lawsuit ever

5        began?

6   A.   Yes, ma'am.

7   Q.   You have known the Coogans, Jay and Nancy, for years?

8   A.   You know, I haven't had a personal relationship with them

9        for years, but I have definitely worked with them through

10       my job capacity at the distribution center.

11  Q.   For over ten years?

12  A.   Yes, closer to that.  Yes, we have talked on the phone for

13       years, got to meet them personally as the sales manager

14       when I became the sales manager.

15  Q.   And in terms of just your work history with the company,

16       my understanding is that you started in 1984?

17  A.   Yes, that's true.

18  Q.   That you worked there for over 13 years before being

19       promoted to the inventory control manager?

20  A.   Yes, ma'am.

21  Q.   And then you were promoted in 2011 to be a sales manager?

22  A.   Yes, ma'am.

23  Q.   And currently as of 2014 you are the operations manager?

24  A.   Yes, that's true.

25  Q.   As an inventory control manager, did you handle only some

|    |    |                                                        |
|----|----|--------------------------------------------------------|
| 1  |    | of the inventory that was going from the distribution  |
| 2  |    | center to all of the stores, or all of it?             |
| 3  | A. | Well, that's kind of a broad question, so basically as the |
| 4  |    | inventory control manager my job was to try to make sure |
| 5  |    | we had product in the distribution center so we could  |
| 6  |    | service them at a high fill rate.  We call it a shipping |
| 7  |    | percentage, so we try to ship a hundred percent, and   |
| 8  |    | depending on how well we do, we maybe miss -- in years |
| 9  |    | past, I think we were about 94 percent.  Right now we are |
| 10 |    | up to about 97 percent in that operations job, and then |
| 11 |    | inventory counts to make sure that accuracy was correct. |
| 12 |    | So I didn't actually physically go count the product.  I |
| 13 |    | had a team of people who did that.  I didn't physically do |
| 14 |    | that.  It was just making sure that it was in the building |
| 15 |    | so that we would service it.  Sorry.  I talk with my    |
| 16 |    | hands.  So sorry about that.                            |
| 17 | Q. | No, that is fine.  The inventory that was being sent to |
| 18 |    | the different NAPAs, was it physically held at the     |
| 19 |    | distribution center where you worked?                  |
| 20 | A. | Some of it was.  We carry about 115,000 skews at the   |
| 21 |    | distribution center.  But our corporate skew count is  |
| 22 |    | about 475.  So, if we have it in the distribution center, |
| 23 |    | we do send it from there, yes.                          |
| 24 | Q. | And you said that you dealt with a team of people.  How |
| 25 |    | many people were you working with when you were the    |

1      inventory control manager?

2   A.  As far as counting the inventory, or --

3   Q.  Yes.

4   A.  We have three to four people who perpetually count the

5       inventory.

6   Q.  And even before you started working at the distribution

7       center, you have other experiences with NAPA stores,

8       right?

9   A.  I do.  My dad was an independent owner from the time I was

10      seven.  So you can call me a NAPA brat if you want to call

11      it that.

12  Q.  And even though your dad was a store owner for years, you

13      weren't ever the person that was physically handling the

14      friction parts, or the gaskets, right?

15  A.  Well, are you talking about installing?  No.  My dad was

16      just like Jay Coogan, he owned a NAPA store.  My dad

17      bought it when I was seven.  He didn't believe in child

18      labor laws, so we all got jobs.  There were six of us.

19      And so we all had jobs that we had to do.  Whether it was

20      sweeping the floor, I think I started at loading the pop

21      machine.

22              I did not open the boxes and touch the parts.

23      Basically if inventory came in, we put it away, and I did

24      a lot of driving in my younger days when we first started

25      to drive.

1  Q.  One of the things that you just mentioned that I wanted to

2      ask about is what you said is you took the product and put

3      it away.  Is it fair to say that you would put the product

4      on the shelves and stock orders almost daily for some of

5      that time?

6  A.  Usually there would be daily stock orders, yes.

7  Q.  Whether being from when you were working at the company

8      for many years, including the years in the 80s and 90s, or

9      in that time that you were stocking parts for your dad,

10     the child labor, you never even knew asbestos parts were

11     being sold?

12 A.  No.

13 Q.  You never saw a warning that stuck out and said, hey, we

14     have a problem with cancer?

15 A.  I can honestly say I never really paid attention.  I was

16     young, into my teens, so girls and boys and things like

17     that were a little more important.

18 Q.  Even when you were working for the company in 1984 and

19     going into 1997 as inventory control manager, you didn't

20     know that some of the inventory that was being sold

21     through the NAPA distribution center you worked at

22     included a variety of asbestos products?

23 A.  No, I normally in the years that you are suggesting, '84

24     to '97, I worked in the office.  So all of my jobs did not

25     involve going to the stock room or handling product.  When

1    I worked in the office it was taking care of customer

2    calls, like if Jay and Nancy called, if that was during

3    their period of time, it was issuing credits, releasing

4    tickets because back then everything wasn't automated.  So

5    most of my job would not have entailed any of that.

6  Q. So even if we go to when you became inventory control in

7    the years 1997, 1998, 1999, 2002 and 2001, the last year

8    that Mr. Frantz indicated that asbestos was being sold?

9  A. Uh-huh.

10 Q. You weren't aware that in the inventory that you helped

11   control there was a variety of asbestos products that were

12   being sold by NAPA?

13 A. The only place that we would be aware of that would be if

14   there was information on the MSDS sheets, and like I said,

15   I have worked in the office so it wasn't like I was

16   installing, so there was no hazard that I knew of, no.

17 Q. Their catalogues that are in evidence, including

18   Exhibit 98, that indicate as late as 1994 in the

19   catalogues in the Colville store, asbestos parts are

20   listed.  That's not something that you were aware of until

21   this lawsuit?

22 A. No.

23 Q. Your role as an operation manager, and even as a sales

24   manager, involved having contact with the local small

25   business owners, the jobbers that were in the NAPA stores,

1     right?

2  A.  Yes.

3  Q.  And the way that you would describe those people are small

4     business owner's?

5  A.  Those are my words.  They are all independent owners, but

6     no franchise agreements, and so basically they are out

7     running their business the way they do as a small

8     business, yes.

9  Q.  People like your father, people like Jay Coogan?

10 A.  Yes.

11 Q.  You had a direct line of contact with those people, right?

12 A.  By phone initially.

13 Q.  Yeah.

14 A.  And then as the sales department in 2013 when I became the

15     sales manager, yes.  I was in the field probably about

16     60,000 miles a year, so, yes, I was in the field.

17 Q.  A lot?

18 A.  Uh-huh.

19 Q.  There are times in your job where you would have daily

20     contact with some of those small business owners, and

21     sometimes it would only be every few weeks, but it was a

22     regular constant contact, right?

23 A.  Well, we had 92 stores that we served out of the

24     distribution center in Spokane, so in the guise of a sales

25     manager, I always had my phone with me, so if they and

1    questions and stuff like that they could always contact

2    me.  But as far as individual visits, you know, given the

3    geographics of our area, so it's the Canadian border,

4    Kelso, White Fish area clear down to Boise, Idaho, if you

5    are familiar with that, and then Missoula to the

6    Tri-Cities.  So quite a few miles geographically to get to

7    all of those stores.

8    Q.  That's how you got to the 60,000?

9    A.  Yes, ma'am.

10   Q.  And my point is that sometimes by phone, less often in

11   person, for each one of those 92 stores you indicated that

12   you had sometimes daily and at the very at least monthly

13   contact with those small business owners?

14   A.  I did my best, yes.

15   Q.  First of all, you were never equipped in those times when

16   you are talking to a person on the phone, or you are in

17   their store talking to them personally, to give any

18   information about asbestos and its hazards because you

19   didn't know it, right?

20   A.  That was during a time period that I wasn't involved in

21   it.  So the time I was in the field was 2011.

22   Q.  Okay.

23   A.  So that was well after any time that you are talking

24   about, yes.

25   Q.  Then let me back up to others.  You are aware that there

```
 1        were manufacturer representatives --
 2   A.   Yes.
 3   Q.   -- that were sent out from the NAPA distribution center,
 4        even before you got there, so going into earlier years,
 5        that would go to the stores?
 6   A.   The manager reps were actually representatives of the
 7        manufacturer, so at that time frame, early on, they
 8        actually were employed by the manufacturer.  They did have
 9        permission to go into our field and work with our
10        customers, and they worked with everything from, you know,
11        making sure they have the right inventory in their stores
12        because each independent owner did have the ability to say
13        this is how much money I want to put in overall inventory
14        expense, and so they worked on their inventory to make
15        sure that they had the right inventory.  They worked on
16        product information.  They went to their customer service
17        events, or customer appreciation events I should say.
18        They actually were trying to be available to help them
19        grow their business, worked with their installers as well.
20   Q.   And when you say "permission," they obtained permission to
21        go to these NAPA small business owners through who?  Who
22        gave them permission?
23   A.   Well, I would say it was information that was done by our
24        corporate office in Atlanta.  They knew these people were
25        hired, and they were given the information and the
```

```
 1          territory that they served, so I guess that I would say
 2          that's probably something that was directed through our
 3          Atlanta office.
 4   Q.     And so the Atlanta office of Genuine Parts Company
 5          permitted people to go on site and talk to the small
 6          business owners?
 7   A.     I would say that, yes, that's true.
 8   Q.     When we first talked there were copies of these manuals, I
 9          don't think the originals, but you are aware that not in a
10          single manual that was ever found in the Colville or
11          Kettle store is there any warnings about asbestos?
12   A.     Well, that's information that's just been gained since we
13          had our deposition.  I mean, that's information you gave
14          me.  I haven't researched it because that's really what
15          Byron would cover.
16   Q.     Let me ask you in terms of the representatives, you would
17          agree with me that as opposed to writing something
18          somewhere in a catalogue, and I think I called it a manual
19          before, a catalogue, it is for most people much more
20          effective to have personal, one-on-one contact, to explain
21          real hazards?
22   A.     Yes, ma'am, but --
23                   MS. LOFTIS:  Your Honor, just a second.
24          Objection.
25                   THE COURT:  Legal grounds?
```

```
 1                    MS. LOFTIS:  Okay.  The legal grounds for my
 2         objection is it calls for an expert opinion on warnings.
 3                    THE COURT:  Sustained.
 4         BY MS. DEAN:
 5    Q.   The opportunity to talk to people face-to-face, to
 6         communicate information when you can make eye contact,
 7         when you can have question and answer, existed for GPC and
 8         the small business owners they work with?
 9                    MS. LOFTIS:  Objection; argumentive.
10                    THE COURT:  That's not argumentive.  It either
11         did or didn't exist, so I will allow the question.
12                    THE WITNESS:  Actually, the representatives
13         were out in the field, but I don't know that they didn't
14         have the communications, because honestly, that was well
15         before my time out in the field.  I mean, they very well
16         may have done that.  You know, I don't have a yes or no on
17         that because I wasn't there in '74.  I was in elementary
18         school, you know, so...
19         BY MS. DEAN:
20    Q.   When Mr. Coogan testified, and you were here, that he
21         never had anything like that, do you have any reason to
22         doubt that based on what you do know?
23                    MS. LOFTIS:  Your Honor, asks this witness to
24         comment on another witness's testimony.
25                    THE COURT:  No.  The question was:  Did she
```

```
 1      have any knowledge that manufacturers reps were given
 2      permission to visit the store owner before her time.
 3                  MS. LOFTIS:  Okay.  Sorry, Your Honor.  I
 4      thought she said something about Jay Coogan's testimony.
 5                  THE COURT:  That's not how I interpreted the
 6      question.
 7                  THE WITNESS:  Can you ask it again?
 8      BY MS. DEAN:
 9   Q. Sure.  Even before your time, do you have any basis to
10      dispute at all that that information did not get to
11      Colville and Kettle that people weren't in the 60s, 70s,
12      80s, 90s being warned of asbestos?
13   A. Well, I think Jay became the owner in the early 90s.  So
14      the 60s, 70s, 80s wouldn't really apply.  And my guess
15      from what I know about a manufacturer rep is they do
16      everything they can to inform the jobber about all things
17      product wise.  Now, whether they talked about asbestos or
18      not, I can't say one way or another, but the 70s, 80s and
19      90s wouldn't even apply to Jay, so he wouldn't during that
20      time.
21                  And then as he became the store owner, I don't
22      know if they did or didn't have a conversation.  It's very
23      possible.  It's very possible not.  I'm sorry.  I can't
24      answer you one way or another.
25   Q. Are you aware that the person that had the cancer wasn't
```

1    Jay, but his brother, Doy?

2  A.  Yes.

3  Q.  And that Doy Coogan, from the information we learned, was

4    getting parts from NAPA stores in the 60s, 70s and 80s,

5    not just the 90s, when Jay had the store?

6  A.  That's what I'm understanding in this case, yes.

7  Q.  Even if we go back to what you personally do know, was

8    there ever any indication from your own father that

9    anything that you were working around was dangerous or

10   carcinogenic, ever?

11  A.  There was no information to me that anything was

12   dangerous, no.  I mean, as we put away freight in boxes,

13   we weren't hanging the parts, and so I'm not sure that it

14   would have come up at all.

15  Q.  I want to ask you a few questions about Jay and Nancy

16   Coogan from the time that you knew them.  You were not

17   provided the three days of deposition testimony that Jay

18   Coogan went through, correct?

19  A.  I have not read it, no.

20  Q.  Okay.  So when you are considering information about Jay

21   and what he was like before this lawsuit, it's limited to

22   what you personally know, correct?

23  A.  Yes.  Yeah.

24  Q.  When you were picked out of all of the people to be

25   representative for these issues, did you make any effort

1    to talk to other people so that you could learn anything

2    about the time frames before you were involved?

3  A.  Well, I think what I was asked to do was to talk about

4    what I knew.  I wasn't asked to do research, and so just

5    like research to me, it's really important to make sure

6    that it's correct, and so I felt like if I came and

7    answered what I knew, that would be the best that I could

8    give you.

9  Q.  So no one before you came said, look, it's really

10   important that you research what is known or know about

11   the company, about the --

12 A.  No, because I was asked just to talk about the

13   relationship between the distribution center and the

14   jobbers and explain what their customers were, and if we

15   reached into that because Jerry, or Doy as you call him,

16   would have been a customer of the Colville store.  We

17   wouldn't have normally interacted with them.

18 Q.  So in terms of understanding that relationship and time

19   frames before you got there, no one asked you to do any

20   research to do anything to find out what the company knew?

21           MS. LOFTIS:  Objection, asked and answered.

22           THE COURT:  It was asked and answered.

23   Sustained.

24   BY MS. DEAN:

25 Q.  What you do know in all the time that you worked with Jay

1       Coogan is that there is not anything about how he

2       conducted his business that you would find unreasonable?

3  A.  No, I would say for the most part, no.  We did have a

4       couple of conflicts on a couple of issues, and we had to

5       work through them.  I would say that all of our

6       independent owners are business people first.  There is no

7       franchise agreement, so we have no real ability to tell

8       them how they are going to stock their store, or face

9       their stores, and so there were a couple of times when I

10      think that you brought up the deal with the batteries.

11      You know, there were issues involved with that.

12  Q.  And so I just want to differentiate two things.  There

13      were some times where there was tension between the

14      distribution center and Jay Coogan?

15  A.  Not necessarily tension.  I would just say that it's

16      clarification of matters.  When you work with somebody,

17      everybody has their own set of ideas how things should

18      happen.  Then there is communication that could just solve

19      it.

20  Q.  And the one that stuck out in your mind was that he was

21      selling nonNAPA batteries and the NAPA distribution center

22      didn't like that?

23  A.  I don't think I said the NAPA distribution center didn't

24      like it.  I said he had the choice of what he stocked,

25      what inventory he stocked, and that came up because they

1    have the ability to go to any other vendor in Spokane, or

2    elsewhere, and bring inventory in.  We would just call

3    that nonNAPA inventory.  We don't price it.  We don't

4    support it in our computer system, but they have the

5    ability to do that, and that's when that came up is he

6    took a whole product line because of the situation that

7    had come up, and he decided he wanted to stock the

8    competitors.  We don't go back up into his territory and

9    sell NAPA batteries to his customers.  We just lose that

10   market, so it isn't something that we, like A-1

11   Distributors, because they are another distributor in

12   Spokane, they sell to everybody in the territory, we don't

13   do that.  We are solely loyal to our customers.  Does that

14   make sense?

15   Q.  Well, I'm just wondering if you remember my question.

16   A.  Okay.  Do you want to ask it again?

17   Q.  Sure.  One of the conflicts that you remember that stuck

18   out is he was selling nonNAPA batteries, and the NAPA

19   distribution center noted that and talked to him about

20   like, hey, why aren't you selling the NAPA product?  Do

21   you remember that?

22        MS. LOFTIS:  I'm going to object to that, Your

23   Honor.

24        THE WITNESS:  Well, I think the answer --

25        MS. LOFTIS:  That question was asked and it

1      was answered.

2              THE COURT:  I will allow the clarification.

3              THE WITNESS:  So the topic came up because we

4      were talking about stocking and nonstocking batteries.

5      Okay.  And so when I -- I did not say that the

6      distribution center got mad.  That may have been something

7      that Jay said when he was on the stand, and I wasn't privy

8      to those conversations.  What I was saying is he has the

9      right to stock any product because we don't have franchise

10     laws.

11  Q.  And I want to get to the question of whether he was

12     selling NAPA stuff mainly, and whether you agree with that

13     in a moment, but for now I have a very straight question.

14     An example of a conflict that you had was a very simple

15     one where NAPA contacted him because he made a decision to

16     sell a nonNAPA line of batteries; fair?

17  A.  Yes, and I believe that the contact would be what

18     happened, you know, what's going on, what do we need to

19     do?  But once again, that would have been between most

20     likely my general manager and him.  I wouldn't have been

21     part of those conversations.

22  Q.  And even in the situations where there was some kind of a

23     business disagreement or conflict, it is still your

24     opinion from firsthand knowledge of working with him, that

25     your words to describe him would be that he was a

1   reasonable, straightforward person?

2 A. Yes, and I do believe he would probably add in there

3   stubborn, you know, so when he decided something, that we

4   would go that direction with it.  But as far as our

5   independent owners, all of them are hard working.  They

6   wear several hats.  They are inventory control managers.

7   They handle their employees, and they make sure that they

8   have the right inventory and all of those things, and

9   so...

10 Q. And I don't want to ask about everyone, but specifically

11   what you knew about him, Jay Coogan, the person that was

12   in the Colville store?

13 A. Sure.

14 Q. You said stubborn?

15 A. That would be his term.

16          MS. LOFTIS:  Objection, Your Honor.

17          THE WITNESS:  He has told me before he is

18   stubborn.

19          MS. LOFTIS:  I object on relevance.  It's

20   character testimony.

21          THE COURT:  I don't see what character has to

22   do with it.

23          MS. LOFTIS:  And can she take that down?

24          THE COURT:  If you would take that down.  I'm

25   more interested in the specifics of their relationship,

1    not her observations of his character, be it good or ill.

2              MS. DEAN:  I will make it more specific.

3    ///

4    BY MS. DEAN:

5    Q.  There is a suggestion, I think you were here for it, that

6        he was the type of person that would say, these came in

7        from the NAPA store and --

8              MS. LOFTIS:  Your Honor --

9    BY MS. DEAN:

10   Q.  -- actually he got them from eBay, do you remember that?

11   A.  I remember the question.

12             THE COURT:  Whoa, whoa, whoa.

13             THE WITNESS:  I'm sorry.

14             THE COURT:  Relevance objection?

15             MS. LOFTIS:  Witness bolstering.

16             THE COURT:  There is no commenting on another

17   witness.  She can tell what she knows, and what he did,

18   but she is not going to comment on another witness's

19   testimony.  That's improper.  Sustain the objection.

20   BY MS. DEAN:

21   Q.  In terms of what you knew and what you did, you found him

22       in all business matters to be straightforward?

23   A.  With my direct relationship with him, yes, he was

24       straightforward.

25   Q.  If we want to know how the company you worked for, Genuine

1    Parts Company, assessed Jay Coogan before this lawsuit,

2    they had a program to identify people that were excellent,

3    true?

4  A.   True.

5  Q.   You are familiar with this ring?

6            MS. LOFTIS:  Your Honor, I'm going to ask what

7    the relevance of this is.  It is witness bolstering.

8            THE COURT:  I'm not sure that it is.  I will

9    hear this answer.

10            THE WITNESS:  Sure.  So Genuine Parts Company

11    has a program called a Five Star Program, and it's been

12    going on for a few years, maybe 10, 15 years.  And so this

13    may be preceding some of the information.  However, what

14    it is, is it's a way to honor the customers that we have

15    and there is criteria.  So, because we don't have a

16    franchise agreement, there are things that are really

17    important for the brand, and that's what NAPA is, it's a

18    brand.  And so when our jobbers -- some of the things that

19    we ask them to do on the list to become Five Star worthy,

20    they have a purchase increase, which usually also means a

21    sales increase.  They have to have so many people that are

22    ASE certified in the store, and that means they are

23    technically certified with a national certification.  They

24    make sure that the outside of the store is painted in the

25    brand paint, the interior is done with planograms and

1   whatnot in what would be recommended.  And there is

2   probably a couple of more scenarios, you know.  So they

3   would get so many points for each one of those things.  So

4   if they have a six percent sales purchase increase, they

5   paint the exterior of their store.  If they set up so many

6   planograms they get points for each one of those.  And if

7   they meet the point criteria, then they are given that

8   award.

9   Q.  Sales of what?

10  A.  Excuse me?

11  Q.  Sales of what?

12  A.  Purchases, actually.

13  Q.  What?

14  A.  What?  NAPA auto parts.

15  Q.  From whom?

16  A.  The distribution center.

17  Q.  It's an excellent award, as stated by the name, in part

18      determined because you are selling your stuff, the NAPA

19      stuff, right?

20  A.  Yeah.  They are purchasing the NAPA stuff, yes.

21  Q.  How many times was he awarded, if you know, the Five Star

22      Excellence Award for his service at NAPA stores?

23  A.  I personally don't know.  I think he testified to four or

24      five.

25  Q.  Are you familiar -- Well, let me go to the Power Point

1    now.  I want to talk about just a few basic things.  You

2    work for the Genuine Parts Company in the distribution

3    center?

4  A.  In Spokane, yes.

5  Q.  Their headquarters are in Atlanta?

6  A.  Yes, ma'am.

7  Q.  They sent products from NAPA distribution centers which

8    are located throughout the country, and one of them is in

9    Spokane?

10  A.  Yes, there is 58, I believe, across the country.

11  Q.  And then part of that chain of distribution is they send

12    parts to different NAPA stores throughout whatever region

13    they are in?

14  A.  Yes, ma'am.

15  Q.  Okay.  And in terms of understanding what particular parts

16    were sold in Colville versus Kettle in the years in the

17    60s, 70s and 80s, did you do any research in order to tell

18    us about that?

19  A.  No, because I wasn't asked to.

20  Q.  No one ever asked you to do that?

21  A.  Neither did you.  I mean, in your deposition I didn't see

22    anything like that.

23  Q.  You don't recall specifically being asked and being told

24    you didn't know, and no one told you then to look?

25  A.  No.  What I was told is I was talking about the

```
 1        relationship, and being able to explain the relationship

 2        between the distribution center, the independent owner,

 3        and then their customer and how that all correlates.

 4   Q.   And in terms of understanding that in the years of the

 5        60s, 70s and 80s, as it relates to distribution of

 6        asbestos products, you don't know anything about that?

 7   A.   No, ma'am, I don't.

 8                  MS. DEAN:  Your Honor, at this time we do

 9        request that that instruction be given.

10                  THE COURT:  Ladies and gentlemen, we will take

11        our afternoon recess and the lawyers and I will go over

12        this.

13                  (The following proceedings were held

14                  outside the presence of the jury.)

15                  THE COURT:  Ms. Dean

16                  MS. DEAN:  Your Honor, the legal basis for the

17        instruction was something that Mr. Adams had actually

18        researched.

19                  THE COURT:  Go ahead, Mr. Adams.

20                  MR. ADAMS:  Sure, Your Honor.  Just a couple

21        of quick points.  You asked us all to submit a four-page

22        briefing on the issue of --

23                  THE COURT:  And I was grateful that you heeded

24        my limits.

25                  MR. ADAMS:  And I don't want to be petty, but
```

LIANE BREWER - Direct Examination/Dean                48

```
 1      J-MM complied, Victor complied, the plaintiffs complied,

 2      and the GPC brief, five pages.

 3              THE COURT:  Go ahead, Mr. Adams.

 4              MR. ADAMS:  So in the brief I think the

 5      argument was that it was an improper comment on the

 6      evidence to give the instruction.  We amended the

 7      instruction.  It's attached as Exhibit A to our motion.

 8      It makes no mention of Byron Frantz, Ms. Brewer or any

 9      defendant by name.  We took that out.  It's simply an

10      instruction on what a corporate representative is, and how

11      they are to be prepared.

12              THE COURT:  And of course, I have left that in

13      my chambers, so I will tell you what, why don't we take

14      about ten minutes of a recess and I will come back out and

15      we will hash this through.  I just left the paperwork back

16      in my chambers, and so we will be at recess until 3:00.

17              (Court at recess.)

18              THE COURT:  Two minutes.

19              MR. ADAMS:  We just want the proposed

20      instruction.  It's supported by the laws and the facts,

21      and it's necessary because Ms. Dean just asked Ms. Brewer

22      about the most fundamental issue in any asbestos case

23      every time:  Did your product contain asbestos and when.

24      What was the relationship between the NAPA distribution

25      stores and the Kettle Falls store with respect to
```

1   asbestos-containing products.  And Ms. Brewer, sitting

2   here as GPC, said she didn't know and she hadn't looked.

3   　　　　　　　　THE COURT:  Do you perceive the distinction

4   between 30(b)(6) requirements and 43(f) requirements?

5   　　　　　　　　MR. ADAMS:  There is a distinction.  The case

6   law is absolutely clear, which we attached, or we

7   referenced in our brief.  It's the --

8   　　　　　　　　THE COURT:  I read that case.

9   　　　　　　　　MR. ADAMS:  It's the Brazos case.

10  　　　　　　　　THE COURT:  But that's a Sixth Circuit case.

11  　　　　　　　　MR. ADAMS:  But it's highly persuasive

12  authority and it's directly on point.  If you look at

13  page 3 of GPC's own brief, the first footnote they say

14  30(b)(6) in federal court and 30(b)(6) in Washington are

15  nearly identical.  Federal case law is highly persuasive.

16  That's in GPC's.

17  　　　　　　　　THE COURT:  This isn't 30(b)(6).  We are

18  taking about 43(f).

19  　　　　　　　　MR. ADAMS:  If you look at the Brazos case, it

20  said explicitly that the corporate representative

21  testifying at trial, not at a deposition, at trial,

22  exactly what we have here, it says that corporate

23  representative is not just testifying about personal

24  knowledge.  They are testifying vicariously about the

25  corporation's own knowledge and perception and subjective

1    beliefs.  The corporation's own knowledge, perception and

2    subjective beliefs are fair game, and most importantly,

3    the witness must be prepared on those topics by the

4    corporation.  That's the Brazos decision.  It's basically

5    three key sentences, three key paragraphs at page 434.

6                   THE COURT:  Right.

7                   MR. ADAMS:  And so our instruction is based on

8    that clear, directly on-point case law.

9                   THE COURT:  Thank you, Mr. Adams.

10                  MR. ADAMS:  And the case --

11                  THE COURT:  Two minutes.  I read the brief,

12   and so --

13                  MR. ADAMS:  Thank you, Your Honor. Okay.

14                  THE COURT:  Ms. Loftis.

15                  MR. OSBURN:  Well, Mr. Hanrahan was going to

16   do this, and he didn't show up.

17                  THE COURT:  Whoever is up next.

18                  MR. OSBURN:  It would be here.  Your Honor is

19   correct that there is a difference between 30(b)(6) and

20   43(f).  As we cited in the brief, Judge Pechman of the

21   Western Direct of Washington recently wrote, "Defendant's

22   obligations under 30(b)(6) are fulfilled.  The rule

23   contains no language compelling the corporate

24   representative's testimony at trial."

25                  Now, we have -- I don't know if you have got a

1   copy of the Sixth Amendment notice that plaintiff gave,

2   and the Exhibit A and list of agreements and discussion

3   about what Ms. Brewer would testify to in the deposition,

4   and she did.

5           THE COURT:  Sure, that's part of 30(b)(6).

6           MR. OSBURN:  That's part of 30(b)(6).

7           THE COURT:  And so what if a corporate

8   representative is, you know, ordered under notice, under

9   CR 30(b)(6), and they don't know anything about it,

10  haven't done any research, and don't have a thing to say

11  about the issue at hand, but they are there as a party?

12  What is to be done at that point?

13          MR. OSBURN:  They are there as a party.  There

14  is actually a few court cases that talked about it.  There

15  was a decision that said it was actually error to compel a

16  corporate witness when they didn't have any knowledge of

17  what was going on in the case generally.

18          THE COURT:  The seminal case in Washington is

19  Campbell vs. A.H. Robins, 32 Wn.App. 98.  That is

20  definitely not the law, but they can compel 12 corporate

21  representatives.  That's not -- my question to you is:

22  How is the Court to handle, let's say, and this is an

23  extreme example, that they trot somebody up here as the

24  corporate representative.  It's some young person from the

25  mail room, if they still have them, which didn't know

1    anything about anything, but they are the corporate

2    representative.  How --

3             MR. OSBURN:  That's not what we have.

4             THE COURT:  But we are simply talking about a

5    matter to the degree because we do have a witness who

6    doesn't know anything about much of the information that

7    is being inquired of her.

8             MR. OSBURN:  But she knows about the

9    information that she is supposed to know about.  She has a

10   certain knowledge base that talks about stores.  I mean,

11   this is the Exhibit A factors, stores in the northeastern

12   section of Washington State and issues specific to the

13   Coogan lawsuit regarding to NAPA GPC.  Discuss Jay

14   Coogan's testimony including what GPC/NAPA knows of his

15   relationship and habits in northeastern Washington.

16   Everything they know about Jerry Coogan Excavating.

17   That's the subject of testimony.

18            THE COURT:  I read that.

19            MR. OSBURN:  She knows those.  That's what

20   she's --

21            THE COURT:  You get one minute at the end, Mr.

22   Adams.

23            Mr. Massenburg, I know your brief points out a

24   little different spin on this.  Your corporate

25   representative is called by deposition.

1          Ms. Lin, I'm sorry.  I don't mean to ignore

2     you.  Are you on base here?

3          MS. LIN:  It seems that you have already

4     understood our argument.  We adopted GPC's legal argument.

5     The jury instruction is legally unsupported.  But as to

6     J-M Manufacturing, it's just factually unsupported.  They

7     designated testimony over our objection taken in a case in

8     Texas, so it was -- it wasn't pursuant to Washington's

9     30(b)(6) or 43(f).  It went to Texas law, and so...

10          THE COURT:  There was also prior sworn

11     testimony from a party, so that part -- I understand that

12     your situation is different and, you know, because of the

13     witness as rolled out you are probably going to have this

14     issue with your representative, but what I do want to hear

15     from you, if you have a position, and what I heard is that

16     you just adopted Genuine Parts --

17          MS. LIN:  Their legal argument.

18          THE COURT:  That's cool, if that's what you

19     want to do.

20          MS. LIN:  Our position is that the proposed

21     jury instruction is legally unsupported.  There is no

22     support in the Washington case law for the giving of this

23     instruction, but as to J-M Manufacturing, it's just

24     factually incorrect.

25          THE COURT:  Thank you.

1          MR. WALDEN:  Your Honor --

2          THE COURT:  Mr. Ricketts wrote a brief.  Are

3     you going to let him talk?

4          MR. WALDEN:  We join GPC's motion is basically

5     what we did.  Of course, our corporate representative

6     hasn't been called in any way, shape or form yet in the

7     case.  We do believe that this particular instruction, if

8     given, constitutes a comment on the weight of the evidence

9     with regard to what the corporations were required to do

10    for trial testimony from a live witness, and we don't

11    think that that is correct.

12         THE COURT:  Okay.  Thank you.

13         You get one minute, Mr. Adams.

14         MR. ADAMS:  To answer the Court's question

15    about what happens if a corporation brings to trial a

16    witness who doesn't know anything and only testifies from

17    personal knowledge, it's a nonappearance and the Court

18    enters default judgment against the defendant.

19         THE COURT:  Well, I can presume what your

20    response is to that.  Here is my concern, and I read

21    Campbell vs. A.H. Robins, which is the lead case of

22    remarkably few cases on CR 43(f) in Washington State.  It

23    gives the trial court the authority the demand the

24    presence of out-of-state, even out-of-country corporate

25    representatives.  In fact, the trial court got reversed

1    for not doing that.  Judge Reingold, who was speaking for

2    the Court of Appeals at that time, said that corporations

3    basically because of their involvement in the litigation,

4    are obliged to have people here.  What it doesn't say is

5    that it's co-extensive with the parameters of CR 30(b)(6)

6    and, in fact, distinguishes 30(b)(6) from the corporate

7    representative issue in large part because they are two

8    different things.  One is a discovery rule and the other

9    is a rule related to appearances of parties of trial.

10    So I have not found anywhere in Washington law

11    where a -- where an instruction such as that proposed by

12    plaintiffs in this case has been given.  The purpose of

13    jury instructions is to, in the aggregate, allow each

14    party to have a fair opportunity to argue their case, and

15    I don't see that in this particular case the plaintiff, or

16    any of the parties frankly, would be prohibited from

17    arguing that they brought this witness in here, she really

18    didn't know anything.  You know, they weren't -- they

19    weren't responsive to questions, whatever it was that

20    makes you feel that it would improve your position in the

21    jury's evaluation of the evidence.

22    Instructions are interpreted as a whole, and

23    they are generally fair if they are correct statements of

24    the law, and they give each party an opportunity to argue

25    their theory of the case.

1          My concern here, as I understand you have

2     cited the Fifth Circuit case, but my concern here is this

3     is more nuance than just a corporate representative coming

4     in from the mail room who doesn't know anything.  We have

5     two corporate representatives in this case, which is

6     entirely permissible.  In Robins there were 12, so two

7     doesn't seem to be a stretch.  And before I go on apropos

8     to your comment, Ms. Loftis, in Robins they allowed both

9     the witnesses to be subpoenaed and designated in CR 43(f).

10         But what it doesn't say is that there is some

11    method that the jury is going to be instructed by which

12    they are supposed to filter the testimony of the corporate

13    representative.  And in particular in this case where we

14    have two corporate representatives, one of whom was

15    apparently to be brought in on the broad issue of what the

16    company knew, when they knew it, what kind of warnings

17    they gave, what kind of instructions they gave to the

18    jobbers or to the other employees at Genuine Parts, and

19    then this witness, who is sort of a mixture of fact

20    witness, because of her relationship with Mr. Jay Coogan,

21    and a corporate representative, because she worked for

22    Genuine Parts Company for 32 years.

23         I don't think that holding her to the kind of

24    knowledge about what, you know, what warnings were given,

25    you know, and what was known in the 70s when she was in

1    grade school, while the corporate representatives often

2    have to research corporate history because that's why you

3    have a representative, and people die and move away, I

4    don't think that it impedes the plaintiff's ability to

5    argue that she couldn't answer questions, and therefore,

6    you know, it was her testimony somehow coming short of the

7    level of proof that is needed by Genuine Parts to have a

8    defense to the various issues that are before the jury.

9            I don't think that that is impeded by the

10   failure to give the instruction.  I'm very reluctant to

11   instruct the jury about how they are to view any

12   particular witness's testimony.  There is one jury

13   instruction in the entirety of the pattern instructions

14   that talks about what a witness is supposed to know, and

15   how jurors are supposed to interpret that witness's

16   testimony.  It's the law about an attending physician in a

17   worker's compensation case which is entitled to special

18   consideration, and you can read through the instructions

19   until you have gone start to finish and you won't find

20   other one that talks about how jurors are supposed to

21   interpret the testimony of witnesses.  So that's my

22   ruling, and we will go from there.

23            MS. LOFTIS:  Your Honor, and if I could be

24   heard on a different issue?

25            MR. ADAMS:  I have another issues.

1          THE COURT:  Okay.  Go ahead, Mr. Adams, and
2     then Ms. Loftis.
3          MR. ADAMS:  I understand and appreciate the
4     Court's ruling.  I'm not going to reargue it.  The only
5     thing I will say is that there are three paragraphs in the
6     case that deal with the exact issue the Court is
7     struggling with:  What does 30(b)(6) mean at trial, and
8     they answer the question unequivocally in our favor, and
9     it's a part of this instruction, so I would only direct
10    the Court of those three paragraphs.
11         THE COURT:  And I read the case.  It was an
12    interesting case, but thank you, Mr. Adams.  I thought you
13    had one more --
14         MR. ADAMS:  I had one more issue, a separate
15    issue.
16         THE COURT:  What is your separate issue?
17         MR. ADAMS:  There were some questions about
18    the credibility of Jay Coogan directed to Ms. Brewer.
19         THE COURT:  And that's bolstering or
20    commenting on -- you know, one witness is not permitted to
21    comment on the testimony of another witness.  You can
22    comment on opinions if, you know, if an expert witness has
23    a different opinion, you know, Dr. Smith says one thing,
24    you say what do you say in response to that, and that's
25    okay.  But when it comes to the credibility of the

1    witnesses and whether one witness is more or less

2    believable than the other, and why shouldn't we believe

3    one witness based on the other witness's observation of

4    that person's character or their reputation for

5    truthfulness, can't do that.

6         MR. ADAMS:  The only reason, and I understand

7    that we don't want witnesses talking about character of

8    other witnesses at trial.  The only problem is that door

9    has not just been opened, but it's been knocked down with

10   a sledgehammer.  Mr. Coogan, Jay Coogan, has been accused

11   of getting on the witness stand, raising his right hand

12   under penalty of perjury, talking about catalogues that he

13   got from his store and that was all a lie because he

14   really got them from eBay.

15        THE COURT:  I understand that, but this

16   witness doesn't know whether he got them from eBay or had

17   them in the store, and her impression of Mr. Coogan's

18   character or his reputation for truthfulness and honesty

19   is irrelevant.  I mean, you know, Mr. Jay Coogan testified

20   about circumstances by which he came into possession of

21   those catalogues, and without any particular evidence it

22   was suggested that he got them on eBay, or from some other

23   source.  You can argue that if you would like, but this

24   witness has no knowledge of where Mr. Coogan obtained --

25   unless she does.  I mean, that would be a different

1     situation, I suppose, that you would ask the company

2     distributed such information.  But where we got the Victor

3     catalogue from 1955 is something that I have serious

4     doubts about whether this witness has personal knowledge

5     of.

6             MR. ADAMS:  Thank you, Your Honor.

7             MS. LOFTIS:  Your Honor, I hope this is the

8     last error that I have to report to you, but that witness

9     subpoena that we gave you, they were absolutely right, he

10    was not on our witness list, but there is another witness

11    that is, and we will give you an updated subpoena on

12    Monday.  We have no intention of trying to serve the

13    subpoena that you signed, so I apologize.

14            THE COURT:  Well, thank you.  Better now than

15    later.  Thank you, Ms. Loftis.

16            If we can just have the jury back, Merri.

17            MS. LOFTIS:  Can Ms. Brewer go back and resume

18    her seat?

19            THE COURT:  Yes, she can go back and resume

20    her seat.

21            (The following proceedings were held

22             in the presence of the jury.)

23            THE COURT:  You can be seated.

24            Ms. Dean, you may proceed.

25            MS. DEAN:  At this time we are marking as

1    Exhibit 237, which is the notice of deposition for

2    Ms. Brewer.

3              THE COURT:  Okay.

4              MS. DEAN:  May I approach?

5              THE COURT:  You may.

6    BY MS. DEAN:

7  Q.  Ms. Brewer, you remember one of the first questions I had

8    today was that when we first met I was interested in

9    speaking to you as the corporate representative of the

10   company, and you acknowledged that you were there in that

11   role.  Do you remember that?

12 A.  As a corporate witness, yes.  There were going to be a

13   couple of them.

14 Q.  And you understood that there was specific topics that we

15   really wanted to learn about and that they were listed,

16   right?

17 A.  I understood from the information that I had was that you

18   were interested in the -- because we had Byron Frantz

19   coming as a corporate witness to handle all of the

20   friction information and all of that, that I was basically

21   just going to talk about the relationship between Genuine

22   Parts Company and independent stores and how we helped

23   them service their customers, yes.

24 Q.  And the one for you, as opposed to Mr. Frantz, was related

25   to your deposition that was taken on November 16th of last

1    year, right?

2  A.  Right.

3  Q.  And you understood that understanding the relationship

4    from the distribution center to the Kettle Falls and

5    Colville stores was something that we explicitly wanted to

6    know and understand?

7  A.  Sure, it was -- Jay Coogan had only been an owner since

8    '92, so I felt like I could speak to that, and I do

9    understand the inventory distribution, how that works

10    between the distribution center and the independent

11    stores.  I just didn't understand the friction part of it

12    because I really felt that Byron Frantz was going to help

13    you with that.

14  Q.  I don't mean the friction part.  What I'm interested in is

15    the relationship, not just when Jay Coogan was an owner,

16    but in the 60s, 70s and 80s, that time frame, when Doy

17    Coogan was buying parts from NAPA.  That's something we

18    have talked about and you understood, right?

19  A.  Yes.

20  Q.  Okay.  And if it's helpful to look at what I have just

21    handed you, it was explicitly indicated that being a

22    corporate representative we needed you to look at what the

23    company knew or reasonably had available to the

24    organization, right?  That was told to you in writing

25    before we started?

1    A.   Yeah, I think I was going off the information from

2         attorney information.  I don't know that I actually saw

3         this piece of paper.  I honestly don't remember, because

4         it's been quite a few months ago.

5              However, yes, I do understand, but I also

6         understood that Byron Frantz would be able to help you

7         with all of those questions that had to do with corporate

8         decisions and that information.  That I was really just

9         talking about the relationships in Spokane so you had a

10        local flavor, because Byron, being from Atlanta, not

11        visiting Spokane more than once, wouldn't be able to talk

12        about Jay and Nancy and our distribution center

13        relationship.

14   Q.   And I think you are right about that.  I want to know

15        about the local flavor, what was happening in Colville and

16        Kettle for decades around the 60s, 70s and 80s.  No one

17        told you that you needed to look into that when you showed

18        up on November 16th?

19   A.   Well, I think maybe some of that information would be that

20        I would have gathered that because of my dad being an

21        independent store, and working in the store.  And so I

22        would have some information regarding the relationship,

23        you know.  I mean, I was there when our general manager

24        came to visit.  You know, I was there when we received

25        product from the distribution center.  So maybe I wasn't

1    as broad-thinking as you were expecting, but I do

2    understand that stuff.

3 Q. In terms of the part that you know personally, I want to

4    follow-up for a moment with your dad, but beyond that, if

5    I want to know, like, what was written in Exhibit 237,

6    more than what you know if someone came in the store, but

7    what the company knew or had available to them.  You were

8    never told, and this isn't a criticism of you, you were

9    never told to do that?

10             MS. LOFTIS:  Your Honor, it's not in the

11    notice, and so you have got the notice in front of you.

12    There is an implication --

13             THE COURT:  Why don't you just read what it

14    says, and we will be done with this.

15             MS. DEAN:  Sure.

16    BY MS. DEAN:

17 Q. If you go to the second page, it says, "Defendant shall

18    make available a deponent able to testify as to the

19    matters known or reasonably available to the

20    organization."  Do you see where I'm at?

21 A. No.  I'm sorry.

22 Q. I can point it out, if you would like.

23             THE COURT:  Go ahead.

24    BY MS. DEAN:

25 Q. Second page.  "Defendant shall make available a deponent,

1    a person able to testify as to the matters known, or

2    reasonably available to the organization," and in this

3    case that's Genuine Parts Company, right?

4    A.   Yes.

5    Q.   No one asked you to do that?

6              MS. LOFTIS:   Your Honor, I would like to read

7    the rest of this document.

8              THE COURT:   Go ahead.

9              MS. LOFTIS:   Thank you, Your Honor.   If I

10   could have the ELMO.   This documents read, "For purposes

11   of this request, defendant or GPC, which means Genuine

12   Parts Company/NAPA, topics upon which examination is

13   requested.   No. 1, plaintiffs and defendants reach an

14   agreement by which, one, plaintiffs can use prior

15   deposition transcripts of GPC and NAPA in motion practice

16   subject to specific designation objections.   Two, the

17   deposition of GPC/NAPA in this case will be case specific

18   information.   Three, GPC/NAPA will produce their witness

19   to testify live at trial in this lawsuit.

20             "No. 2, subject to this agreement plaintiffs

21   will depose GPC/NAPA about stores in the northeast section

22   of Washington State and about issues specific to the

23   Coogan lawsuit related to NAPA/GPC.

24             "No. 3, GPC/NAPA must be prepared to discuss

25   Jay Coogan's testimony, including what GPC/NAPA knows

1    about his relationship with NAPA in northeastern

2    Washington.

3              "No. 4, GPC/NAPA must be prepared to discuss

4    everything they know about Jerry Coogan Excavating.

5              "And 5, GPC/NAPA must bring a document

6    custodian who can authenticate historical publications

7    produced in the lawsuit."

8              THE COURT:  Thank you, Ms. Loftis.

9              You may proceed, Ms. Dean.

10   BY MS. DEAN:

11   Q.   And for context, the date and time, November 16th, 2016,

12        that was the deposition of you.  We talked to Mr. Frantz

13        on a different date and different subject, right?

14   A.   Right.  Uh-huh.

15   Q.   And the witness wasn't Liane Brewer, it was Genuine Parts

16        Company, right?  And if it's helpful --

17   A.   Okay.

18   Q.   And that's something that you thought you were doing, this

19        role of being a company representative?

20   A.   Right.

21   Q.   And in asking about that, we explicitly wanted to know

22        what the company knew, and you now understand that that is

23        written in the documents?

24              MS. LOFTIS:  Objection, asked and answered.

25              THE COURT:  I will allow it.  Go ahead.

1              THE WITNESS:  So, once again, I was under the

2      impression that normally one witness is provided from a

3      corporation.  Okay.  Byron Frantz was that witness that

4      would have all of the specifics, because he is based in

5      headquarters, and he would have more relevant information

6      about timing and decisions and all of that having to do

7      with asbestos.

8              From my representative, it was more the

9      northeastern Washington section.  And so I think we were

10     trying to accommodate you by giving you two witnesses so

11     that we could give you as much broad information as we

12     could, because neither Byron or myself could comply with

13     this completely.  And so I think that's why we came up, or

14     we were asked to have two witnesses.

15     BY MS. DEAN:

16  Q.  So did you know that these subjects here were the ones for

17     you, and there were different subjects for Mr. Frantz?

18  A.  No, I didn't know that.

19  Q.  Even if we limit it to a subject that you felt like was

20     about the stores in the northeastern section of Washington

21     State and the issues specific to the Coogan lawsuit,

22     that's what you thought that you were there for, right?

23  A.  Well, and Jerry Coogan Excavating would be very unlikely

24     that any corporate representative would personally know a

25     customer of one of our customers.  I mean, there may be

```
 1              some interaction in the field with our manufacturer rep,
 2              but a corporate representative wouldn't necessarily know a
 3              customer of a customer.
 4     Q.  Which is why I wasn't asking you about that.  But the ones
 5         I have highlighted I did.  If I wanted to know for the
 6         stores in northeastern Washington and the issue specific
 7         to the Coogan lawsuit, that would be the Colville and the
 8         Kettle store, right?
 9     A.  Yes, and I familiar with them.
10     Q.  And if I want to know anything about what your
11         distribution center sold in the 60s, 70s and 80s to those
12         two stores, you don't have any personal knowledge of it,
13         right?
14                   MS. LOFTIS:  Objection; asked and answered.
15                   THE COURT:  This question was a little
16         different.  I will overrule.
17                   THE WITNESS:  Okay.  So given the sales
18         records, no.  And I don't know that anyone would, because
19         there is no historical data kept for that period of time.
20     BY MS. DEAN:
21     Q.  You were asked by me that you go to the Kettle store and
22         talk to anyone other than the owners' daughter, who is a
23         school teacher.  Do you remember that?
24     A.  Yes.
25     Q.  And you admitted that you didn't do any research because
```

```
 1        you didn't think that that was your role?
 2   A.   I guess I'm getting a little confused because you are
 3        throwing, like, this big balloon when you haven't asked me
 4        any questions that I haven't succinctly answered regarding
 5        those stores.  Were there questions in the depositions
 6        that I missed regarding the stores?
 7   Q.   Yes.  The question I super want to know --
 8   A.   Okay.
 9   Q.   -- is for every year that Mr. Coogan, Doy Coogan, was
10        buying brakes and gaskets and clutches in the 60s and the
11        70s and the 80s from the Kettle and Colville NAPA store,
12        that it's true that every one of those came from your
13        distribution center, and I want to know if the company
14        knows that either from your own files or because they did
15        something to find out what was reasonably available to
16        them by talking to anyone that was actually there in that
17        time frame?
18                  MS. LOFTIS:  I'm going to object.
19                  THE COURT:  I just need to hear the question.
20                  MS. DEAN:  And ma'am, you were never asked to
21        do that?
22                  THE COURT:  Okay.  So that was the question.
23        Now I will hear the objection.
24                  MS. LOFTIS:  Move to strike the predicate,
25        Your Honor.
```

1          THE COURT:  Well, she was reading from the

2     exhibit that everybody read from.

3          MS. LOFTIS:  The predicate was that -- what

4     she said was that it's been proven that he purchased all

5     of this stuff from the NAPA store.  That hasn't been

6     proven, Your Honor.

7          THE COURT:  That's kind of the whole problem

8     here.  You know, this witness apparently was requested to

9     find that out and didn't, but go ahead the answer the

10    question as best as she can.  I will allow it.

11         THE WITNESS:  Okay.  So there is a couple of

12    things.  First of all, because the independent store is

13    not franchised, like I said before, they have the ability

14    to buy from anyone.  It's not like if we have a franchise

15    and we have a direct mandate that they can only stock

16    certain inventory.  I know from my dad when the

17    distribution center didn't have something, we would go to

18    other suppliers in the area, and they weren't NAPA.  I

19    mean, there is AJS and Brown Bearing and all of those

20    other locations that we source parts.  And so I would say

21    from my knowledge that, no, that does not mean that Jay

22    bought everything 100 percent.

23         I did do a little research afterwards because

24    you were really concerned about that.  You asked me a

25    couple of times in the deposition.  So the best that I

1    could come up with is that I called the current owner of

2    the Colville store, because Jay and Nancy sold, and asked

3    them if they would run a report and it's called a RPTO 56

4    as far back as their computer would handle it.

5  Q.  I want to interrupt you for a moment.  Did you give that

6    report to your lawyer?

7  A.  I showed it to her, yes.

8  Q.  Do you have any idea why five weeks into trial I haven't

9    seen this?

10           MS. LOFTIS:  She has never asked for it,

11   Your Honor.

12           THE COURT:  Well, we will take that issue up.

13           THE WITNESS:  Well, ma'am --

14           THE COURT:  Wait.

15           THE WITNESS:  Okay.  I'm sorry.

16           THE COURT:  We will take that issue up at

17   another time.

18           Continue with your examination of the witness

19   based on her responses.

20           THE WITNESS:  But actually, I volunteered --

21   oh, I'm sorry.  Not my turn.

22   BY MS. DEAN:

23  Q.  When you and I were sitting in the same room and I wanted

24    to know what was available, you didn't have that, right?

25  A.  No.

1    Q.   I have no idea what you are talking about, even though we

2         sat across from each other and I had a chance to ask you

3         questions, right?

4              MS. LOFTIS:   Your Honor, argumentative.

5              THE COURT:   That is argumentative.   We will

6         take up the issue of the document, if there is one, in due

7         course.   Go ahead.

8         BY MS. DEAN:

9    Q.   Let me ask you this:   It is your view, not only from your

10        father's experience but from your years with the primary

11        place, that these small independent business owners would

12        get their parts from, you, you were primary, the NAPA

13        distribution center where you worked?

14   A.   We would be their main supplier, yes.

15   Q.   And in terms of being their main supplier in the years

16        that you have worked with Jay and Nancy specifically, you

17        can think of examples where they had you use other

18        suppliers, but they never dealt with brakes, gaskets or

19        clutches, correct?

20   A.   Well, I can't say that, because I don't know what they

21        outsourced.   That would have come from their accounts

22        payable, and they could have provided those as well.   So

23        the only thing that I could do, and honestly, I just got

24        this report like three days ago, so it's not something

25        that I have been holding out, because I really thought

1    that there would be records in Doy's office.  And the fact

2    that they were all removed surprised me.  And so I felt

3    like all of that documentation would have been there

4    because he would have had receipts of what he bought in

5    billings where he, you know, billed somebody for digging a

6    well, and stuff like that.

7                   So when I was sitting here and I realized that

8    that wasn't the case, then I thought that maybe it would

9    have been helpful if I were able the get the report, or a

10   report that would allow knowledge of as far as back as the

11   computer would hold of what Jerry got from Jay.

12   Q.  Okay.  And how far back does that go?

13   A.  To 2001.

14   Q.  So if I want to know in the 60s, 70s -- you said 2001?

15   A.  Yes.

16   Q.  So they stopped selling asbestos, according to Byron

17   Frantz, somewhere in 2001?

18   A.  I was just trying to get information that would help, so I

19   understand all of that.

20                  THE COURT:  Would you wait for the question,

21   please, to be out.  Don't interrupt.

22                  THE WITNESS:  I'm sorry.

23                  THE COURT:  Don't interrupt the questioner,

24   and I won't let her interrupt you.

25                  THE WITNESS:  Okay.  I'm sorry.

1       BY MS. DEAN:

2    Q.  Who is Mr. Kenner?

3    A.  He would be the owner, I believe, of the Kettle Falls

4        store.

5    Q.  Who is Mike Sparlin?

6    A.  Mike Sparlin is a trainer.  He actually was a manufacturer

7        rep for many years.  He was a manager for Balcam, one of

8        our suppliers, and then he was a trainer that trained on

9        better business practices and stuff like that.  I don't

10       know the scope of what he trained, but I did give you that

11       name at the deposition.

12   Q.  He is retired but still lives in the same community that

13       you live in, right?

14   A.  Yes.

15   Q.  Whether it be Mr. Sparlin, Mr. Kenner, or any of the other

16       people that were doing hands-on work with some of the

17       products, you never contacted them to learn what they

18       knew, fair?

19   A.  I did talk to Mike Sparlin after the deposition, yes.

20   Q.  Is there any reason why you wouldn't have done that before

21       so that I could talk to him about what was going to be

22       reasonably available to the company?

23   A.  Honestly, I didn't know the scope of the questions that

24       you were going to ask, so I apologize for that.

25   Q.  What you do know unequivocally, as I understand it, is

1    that through your experiences, both with your dad being a

2    small business owner and on the other end, that you would

3    expect exactly what Jay said, and that is most of the

4    parts would come from your distribution center?

5           MS. LOFTIS:  Objection, asked and answered.

6           THE COURT:  Well, no.  I will allow the

7    question and then move onto another topic.

8           THE WITNESS:  So what I would say is that

9    Genuine Parts Company, like I said before, we have a

10   service bill rate, and on any given day, out of 100 parts

11   that are ordered, and there's probably 10,000 or 11,000

12   parts ordered per day, anywhere between four and

13   seven percent in that time frame when I was working on it,

14   because things were much more manual, there were seven --

15   out of every 100 parts that we didn't ship on any given

16   day.  And so of those seven, if that was something for a

17   shop that was hanging a part, or installing a part, then

18   that store would source it from anyone else, either in the

19   area or out of the area for that matter, so that they

20   could get that customer taken care of.  And so that

21   seven percent, even though we are a supplier to them

22   directly, if they have a customer they have to take care

23   of, and they are an independent owner, they are going to

24   get that part for that customer so they can get that car

25   off the rack.

1   Q.  And my question is about what's normal, what's primary,

2       what's the typical, and it's to go to the distribution

3       center?

4   A.  That would be one of the main distributors, yes.

5   Q.  I want to hand you what we have marked as 238.  These are

6       just some of the records that you were able to find when I

7       talked to you on November 16th about the NAPA store,

8       correct?

9   A.  Yes.

10  Q.  And that's a true and accurate copy of those records?

11  A.  Yes.

12              THE COURT:  I think we are at 238.

13              MS. DEAN:  Yes, Your Honor.  I seek to admit

14      238 into evidence.

15              THE COURT:  Ms. Loftis.

16              MS. LOFTIS:  Did you say this is an incomplete

17      copy?

18              MS. DEAN:  It is a complete copy of five

19      different documents that they provided.

20              MS. LOFTIS:  You just told her this was a

21      complete copy of the jobber file.  Is it a complete copy

22      of the jobber file?

23              MS. DEAN:  No, I didn't say that there were

24      things in here that after 2001 that have no relevance.

25              THE COURT:  Let's just have the witness

1    identify the documents and, if she can identify them, you

2    can move them, Ms. Loftis can do what she is going to do,

3    and then we will follow the normal procedure.

4    BY MS. DEAN:

5  Q.  So in looking at these, each of these are documents that

6    you provided to me that you were able to find from the GPC

7    file about the Colville auto parts store, correct?

8  A.  Yes.

9  Q.  And those are true and accurate copies of each of those?

10 A.  Yes, they do appear to be.

11 Q.  And there is three or four different letters that you

12    provided me that I have included there.  Those are all

13    complete?

14 A.  They look like ones that we provided, yes.

15 Q.  There was other information, like banking information that

16    you provided that are not included?

17 A.  Yeah, there were letters regarding some MOSDs, I believe,

18    where our old operation manager and Jay had some

19    communication back and forth.  Maybe some signage drawings

20    I think I remember that had to do with an auto care store,

21    stuff like that.

22 Q.  Okay.

23         MS. DEAN:  Your Honor, we seek to admit that

24    as an exhibit.

25         THE COURT:  Ms. Loftis.

1            MS. LOFTIS:  We have no objection to entering

2       the complete copy of the file, but piecemeal we do have an

3       objection to.

4            THE COURT:  Well, I don't want to enter the

5       banking information and the financial information without

6       redaction, and so if you want to introduce evidence when

7       its your time to talk to this witness that you believe are

8       necessary for ER 106, then you may certainly do so.

9            MS. LOFTIS:  Okay.  Thank you, Your Honor.

10            THE COURT:  Thank you.  Exhibit 238 will be

11       admitted.

12                 (Exhibit No. 238 admitted.)

13  BY MS. DEAN:

14  Q.  Finally I want to talk to you for a moment, just about the

15       mission statement for Genuine Parts Company in the

16       30 years that you have worked there and ask that --

17            MS. DEAN:  For reference, Your Honor, this was

18       marked as 236.

19            THE COURT:  I'm sorry.  I didn't hear you.

20            MS. DEAN:  This was marked as 236.

21            THE COURT:  Okay.

22  BY MS. DEAN:

23  Q.  And you can see there at the bottom that this is part of

24       the Genuine Parts Company website?

25  A.  Is there something on here that you want me to

1    specifically look at?

2    Q.  No, just to start off with, there is a reference at the

3        bottom, you can see the URL is referencing the Genuine

4        Parts Company that you worked for for 32 years.

5    A.  Yes.

6              MS. DEAN:  Your Honor, at this time we seek to

7        admit Exhibit 236 into evidence.

8              MS. LOFTIS:  Your Honor, I would say relevance

9        to this.  This looks like a jobs at Genuine Parts Company

10       document.  I'm not sure what relevance it has.

11             THE COURT:  Could I see it, please?  Thank

12       you.

13             MS. LOFTIS:  Your Honor, in the interest of

14       time, too, I would object to this as cumulative of the

15       testimony that has already been in this case through

16       Mr. Byron Frantz over a two-day period.

17             THE COURT:  Well, I haven't heard any

18       testimony about it yet, so I'm not sure if it's

19       cumulative.  It appears to be statements issued by Genuine

20       Parts Company related to the manner in which they deal

21       with their distribution centers, NAPA jobbers.  I will

22       admit 236.

23                 (Exhibit No. 236 admitted.)

24    BY MS. DEAN:

25    Q.  This is the last thing I want to ask you about.  On the

1    first page of the website, first of all, you can just see
2    the Genuine Parts Company logo at the top?
3  A.  Yes, I do.
4  Q.  And it indicates, again, at the bottom just the source,
5    that this came from the Genuine Parts Company website
6    section called "our culture"?
7  A.  Okay.
8  Q.  There in the section about "our culture" they have our ten
9    commandments that are referenced there.  I want to ask you
10   about several of time.  They say things like, be committed
11   to growth, be committed to service, and to the quality of
12   our service, be committed to customers.  Do you see that?
13 A.  Yes, ma'am.
14 Q.  Okay.  And it goes on to say be committed to your people
15   and commit to making the right decisions, even in the
16   toughest of times, and be committed to living up to your
17   commitments.  Do you see that?
18 A.  Yes.
19 Q.  And these are things that a company, if they put on their
20   website, should actually do and practice, right?
21        MS. LOFTIS:  I'm going to object, Your Honor,
22   for opinion testimony.  She is here as a fact witness.
23   What companies should or should not do is really not in
24   the scope of her testimony.
25        THE COURT:  I think you can go over the

1    document with her, but her opinions about what is stated

2    in the documents probably are only marginally relevant,

3    but you can continue to inquire about the exhibit.

4    BY MS. DEAN:

5    Q.  Have you seen for years materials put out by Genuine Parts

6        Company the NAPA logo where it says "assurance of

7        quality"?

8                    MS. LOFTIS:  Objection, asked and answered at

9    length in Mr. Byron Frantz' deposition, Your Honor.

10                   THE COURT:  Well, the first question is

11   whether she has seen it, so that's a predicate question.

12                   THE WITNESS:  Yes, ma'am.  Through your

13   catalogue that you showed me, but I have seen that, and I

14   think if you are asking me to comment on that, it's

15   Genuine Parts Company not only had a responsibility for

16   safety regarding asbestos, but they also had a

17   responsibility for stopping cars.  So during this

18   transition when you hear the back and forth about whether

19   or not asbestos is or is not safe, and they are trying to

20   figure that out, they still had hundreds of thousands of

21   brakes out there, I should say cars, that needed to be

22   able to stop.  And so that also had to be weighed into --

23   I'm sure, I mean, I'm guessing here, but I think that that

24   would be one of our corporation's biggest concerns that a

25   hundred percent of the time when they put a product out it

 1    would stop the car.

 2              MS. DEAN:  Your Honor, I'm going to object to

 3    being unresponsive.

 4              THE COURT:  The narrative would be stricken.

 5    Please confine yourself to the question and don't

 6    volunteer information that you think will or will not be

 7    helpful.

 8              THE WITNESS:  All right.

 9    BY MS. DEAN:

10    Q.  In terms of the timeline of when good quality brakes that

11        had no asbestos, that is not something that you know

12        anything about?

13    A.  No, that is what Byron Frantz was going to help you with.

14    Q.  If a company has the logo, "we are assuring quality," do

15        they need to live up to that commitment if it doesn't?

16              MS. LOFTIS:  Your Honor, argumentive, and

17    again, it's asking for her opinion testimony.

18              THE COURT:  Well, it's argumentative.

19    Sustained.

20    BY MS. DEAN:

21    Q.  There is another section that just talks about the

22        different GPC brands.  Do you see that?

23    A.  Yes.

24    Q.  It says, "Genuine Parts Company is a diversified global

25        leader compromised of ten distinct business units," and

```
 1        one of those units you are aware of is the Rayloc

 2        division?

 3   A.   Yes, ma'am.

 4   Q.   And another is the NAPA division?

 5   A.   It's not actually NAPA.  NAPA is just the brand that

 6        encompasses it.  So NAPA is an entity, a brand logo that

 7        the service of pulling all of these parts together under.

 8        So it's actually not part of Genuine Parts Company.  I

 9        think at one point I heard they maybe they had six or

10        seven employees under the NAPA part, and that's for the

11        branding part of it.

12   Q.   When it says on their website they have ten distinct

13        business units, they list out ten distinct business

14        units --

15   A.   But would that --

16   Q.   -- on the next page, right?

17                 MS. LOFTIS:  Your Honor, she is being asked to

18        speculate about this document.  I'm not sure she has even

19        seen it before.

20                 THE COURT:  If she doesn't know, she can say I

21        don't know.  I mean, this is a document that, you know,

22        was provided to the northeast Washington distribution

23        group.  It's on the website, and if the witness doesn't

24        know, she can say she doesn't know.

25        BY MS. DEAN:
```

1  Q.  How many employees did you say that you believed NAPA had,
2      two to three?
3  A.  Well, the brand, from what I understand, has that many.
4      Genuine Parts Company is the umbrella that encompasses
5      Rayloc and distribution centers and those kind of things.
6  Q.  And in terms of what we have marked as an exhibit, on the
7      website, what is being referenced is that NAPA has been
8      around for a long time, has over 17,000 employees, right?
9  A.  Yes, I see that.
10 Q.  In terms of the mission statement where they reference
11     "our culture", I just have a few questions.  Do you see
12     the section that says, "we are there for each other"?
13 A.  Yes, I do see that.
14 Q.  It says, there isn't a vehicle on the road that doesn't
15     need some repair work every now and again, and they give
16     examples, including brake pads, right?
17 A.  Yes, ma'am.
18 Q.  Our store goes beyond taking care of cars because we take
19     care of people too.  At NAPA, we go the extra mile to lend
20     a helping hand, and offer support when people need it the
21     most.  That's what they write there, right?
22 A.  Yes.
23 Q.  And losing a loved one is probably the time that people
24     need help the most?
25                 MS. LOFTIS:  Your Honor, argumentative.

1     THE COURT:  It's argumentative.  Sustained.

2     BY MS. DEAN:

3  Q.  They also have a section where they claim they are

4     building communities, correct?

5     MS. LOFTIS:  Your Honor, I'm going to object

6     on relevance, because this has no relevance.

7     THE COURT:  I think we are wandering away from

8     relevance, Ms. Dean.  If you have something related to the

9     specific products that are in issue, that's fine.  But

10    opinion testimony about individuals or corporations is not

11    relevant.

12    BY MS. DEAN:

13 Q.  I want to ask you about this part here that talks about

14    the NAPA auto parts, and that would include friction,

15    clutch and gaskets, right, correct?

16 A.  Where are you reading?

17 Q.  Just that the NAPA auto parts that have been sold

18    historically include brakes, clutches and gaskets?

19 A.  Right.  The parts sold through the distribution center in

20    Spokane would have included those products, yes.

21 Q.  Okay.  It says right after that, that our store goes

22    beyond taking cake of cars, that we take care of people,

23    too.  We go the extra mile to lend a helping hand and

24    offer support when people need it the most.

25    MS. LOFTIS:  Your Honor, relevance, and it is

1   intended to inflame the jury.

2         THE COURT:  Sustained.  Well, I don't know

3   about that, but it's not relevant and so I'm going to

4   sustain the objection.

5   BY MS. DEAN:

6   Q.  Have you gone back to the files for this small independent

7      owner of the NAPA store in Colville, Jay Coogan in the

8      90s, to figure out what his entire work history was, not

9      just with the store, but with the Kettle Falls store and

10     others?

11  A.  No, no, I have not.  I mean, I know that he worked at the

12     Kettle Falls store.  He was a repair shop for a period of

13     time, and I believe that they carried inventory there from

14     what I heard, but see, that's the hard part about going

15     back.  I don't know what is hearsay and what's accurate,

16     so I had to be very careful not to just take people's

17     comments and assume that they were gospel, and so I was

18     trying to be very careful not to do that.

19  Q.  In terms of determining how many years he was at the

20     Colville store before he ever became an employee, or how

21     many years he was at the NAPA Kettle Falls store, did you

22     make any effort to verify that one way or another?

23  A.  No, no, I didn't.

24        MS. DEAN:  That's all the questions that I

25   have, given what I know now.

1          THE COURT:  All right.  There is no point

2    really in starting cross-examination.  Ma'am, you can step

3    down.

4          Okay.  It's Thursday again, ladies and

5    gentlemen, so it's time for me to again remind you about

6    the fact that I'm sure as time goes on people's curiosity

7    may be more and more piqued about what is going on and you

8    may face more and more inquiries about that.  I would just

9    admonish you not to discuss the case with friends,

10   neighbors, coworkers, you know, visitors from afar, people

11   who want to know what you are doing.  Hey, how have you

12   been?  You can tell them how you have been, but you can't

13   tell them that what you are doing, other than you can say

14   you have been serving on a jury.

15         Please don't do any research.  No social

16   research, no Wikipedia, nothing about any of the people or

17   the organizations or the products that we have talked

18   about.  It is important that you make your decision in

19   this case based only on the evidence that I admit, you

20   know, as you may have perceived the admission of evidence

21   can be quite a technical enterprise.  We are all doing our

22   best to make sure that you hear all of the relevant

23   evidence and don't hear evidence that isn't relevant or

24   for some other reason is excluded by the Court.  And for

25   that reason, going outside the courtroom to gather outside

1    information can undo that work.

2            So have a great weekend.  We are going to

3    start Monday morning at 9:30.  9:30, Monday morning.

4    Leave your notepads face down.  We will secure them for

5    the weekend.  Thank you very much.  Have a nice weekend.

6    And you folks can go on back to the jury room.

7            (The following proceedings were held

8            outside the presence of the jury.)

9    THE COURT:  In the event that anything comes

10   up, we will be here hearing civil motions in the morning

11   and sentencings in the afternoon if you need to drop

12   anything off.

13           There will also be another 50 people, or 75

14   people here, so you need to secure whatever it is that you

15   think that you need to secure.  We are happy to store it,

16   but I'm a gratuitous bailee and I have no responsibility

17   for what happens to it.  I will maintain the security as

18   best I can, and even if you want to put it back in

19   chambers, I'm happy to do that if you have electronic

20   equipment or what have you, but don't leave it out.

21   MS. DEAN:  Your Honor, just very quickly, if I

22   could, the documents that she said she did have, pursuant

23   to our notice being accurate, I would just ask that they

24   be compelled to provide that today.

25   THE COURT:  If that was part of the request in

1      the interrogatory, production of documents, that's a

2      continuing obligation.  You can talk to Ms. Loftis about

3      that.

4                     (Court at recess.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

2           IN AND FOR THE COUNTY OF PIERCE

3  _____

4                         )

5  GERRI S. COOGAN, the spouse of  )
    JERRY D. COOGAN, deceased, and  )

6  JAMES P. SPURGETIS, solely in his  )
    capacity as the Personal        )

7  Representative of the Estate of  )
    JERRY D. COOGAN, Deceased,,     )

8                        )  Superior Court
             Plaintiffs,    )  No. 15-2-09504-3

9                        )
          vs.               )

10                        )
    BORG-WARNER WORSE TEC INC.;     )

11  et al,                   )
                        )

12            Defendants.    )

13  _____

14              REPORTER'S CERTIFICATE

15  _____

16  STATE OF WASHINGTON )
                 ) ss
  COUNTY OF PIERCE   )

17

18     I, Raelene Semago, Official Court Reporter in the
  State of Washington, County of Pierce, do hereby certify

19  that the forgoing transcript is a full, true, and accurate
  transcript of the proceedings and testimony taken in the

20  matter of the above-entitled cause.

21

22     Dated this _____ day of _____, <u>2017</u>.

23

24                  _____
                  RAELENE SEMAGO, CCR, RPR, CMRS

25                  Official Court Reporter